**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 25-cv-3078-WJM-KAS

JESUS MORALES LOPEZ,

      Petitioner,

v.

JUAN BALTAZAR, in his official capacity as warden
of the Aurora Contract Detention Facility, *et al*.

      Respondents.

---

### AMENDED ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES UNDER EAJA

---

Before the Court is Petitioner Jesus Morales Lopez's Motion for Attorney's Fees

Under the Equal Access to Justice Act, 28 U.S.C. § 2412 ("EAJA") ("Motion").  (ECF No.

49.)  Respondents Juan Baltazar, Warden of Aurora Contract Detention Facility, Robert

Hagan,[1] Field Office Director of Denver Field Office of United States Immigration &

Customs Enforcement ("ICE"), Todd Lyons, Acting Director of ICE, Markwayne Mullin,[2]

Secretary of the United States Department of Homeland Security ("DHS"), and Todd

Blanche,[3] Acting Attorney General of the United States (collectively, "Respondents" or

"Government"), filed a response (ECF No. 55), to which Morales Lopez filed a reply

---

[1] Robert Hagan replaced Robert Guadian as Field Office Director of Denver Field Office of United States Immigration and Customs Enforcement.

[2] Markwayne Mullin replaced Kristi Noem as Secretary of the United States Department of Homeland Security.

[3] Todd Blanche replaced Pamela Bondi as Attorney General of the United States.

(ECF No. 56).

For the following reasons, the Motion is granted in part and denied in part.

## I.    FACTUAL AND PROCEDURAL HISTORY

Morales Lopez is a citizen of Mexico.  (ECF No. 25 at 8.)  He originally entered the United States without inspection in 2005, after which United States Customs and Border Patrol granted him voluntary return.  (*Id.*)  Morales Lopez then reentered the United States without inspection in 2006.  (*Id.*)  He has lived in Colorado since.  (ECF No. 31 at 5.)  Morales Lopez is married with four United States citizen children.  (*Id.*)  He owns a painting business and is "the sole financial provider for his children."  (*Id.*)  As for his criminal history, Respondents aver that, in 2012, Morales Lopez "was convicted twice of driving without a license and careless driving."  (ECF No. 25 at 8.)

On July 2, 2025, ICE arrested Morales Lopez and served him with a notice to appear that charged him as "an alien present in the United States who has not been admitted or paroled" pursuant to Immigration and Nationality Act ("INA") § 212(a)(6)(a)(i), codified at 8 U.S.C. § 1226(a)(6)(a)(i).  (ECF No. 31 at 20.)  DHS decided that Morales Lopez should be detained in the Aurora Contract Detention Facility in Aurora, Colorado, "[p]ursuant to the authority contained in section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulations . . . ."  (*Id.* at 24.)  Morales Lopez then sought redetermination of DHS's detention decision from an immigration judge ("IJ").

On August 14, 2025, an IJ held a bond hearing pursuant to 8 C.F.R. § 1236. (ECF No. 31 at 28.)  Contrary to its earlier representation that Morales Lopez was as an

"alien" "who has not been admitted," DHS reversed course at the bond hearing,[4] arguing that the IJ lacked jurisdiction because Morales Lopez is subject to mandatory detention as an arriving alien under INA § 235(b)(2)(A), codified at 8 U.S.C. § 1225(b)(2)(A).  (ECF No. 1 at 26.)  But the IJ rejected this argument, explaining that Morales Lopez "was not apprehended shortly after his entry [in August 2006], and there is no evidence that he was ever detained under section 235(b) of the INA or granted parole under 212(d)(5)(A).'"  (*Id.*)

The IJ proceeded to consider the merits of Morales Lopez's bond request.  The IJ found that Morales Lopez was "not a threat to public safety" because, while he "does have several traffic infractions over the past 25 years," "[h]e does not have a criminal conviction in the United States."  (*Id.*)  The IJ further found that Morales Lopez was not a flight risk because he

- "has resided in the United States for nineteen years";

- "is married and has four United States citizen (USC) children";

- "has a fixed address where he lives with his wife and children";

- "has stable employment as the owner of a painting company that is incorporated within the State of Colorado"; and

- "is the sole financial provider for his family."

(*Id.*)  Consequently, the IJ granted Morales Lopez bond in the amount of $7,500, which

---

[4] On August 20, 2025—*i.e.*, while the IJ's bond decision was on appeal to the BIA—Respondents purported to cancel their notice of custody determination document, whereby they indicated that Morales Lopez was being detained pursuant to section 1226, by striking through it and writing the word "cancelled."  (ECF No. 31 at 75.)

Morales Lopez avers that he "did not receive proper notice of his cancelled Form."  (*Id.* at 11.)

he posted the next day.  (ECF No. 31 at 28.)

DHS appealed the IJ's bond decision, which triggered the automatic stay provision contained in 8 C.F.R. § 1003.19(i)(2).  (*Id.* at 31.)  That regulation provides as follows:

> ***Automatic stay in certain cases.*** In any case in which DHS has determined that an alien should not be released or has set a bond of $10,000 or more, any order of the immigration judge authorizing release (on bond or otherwise) shall be stayed upon DHS's filing of a notice of intent to appeal the custody redetermination (Form EOIR-43) with the immigration court within one business day of the order, and, except as otherwise provided in 8 CFR 1003.6(c), shall remain in abeyance pending decision of the appeal by the Board.  The decision whether or not to file Form EOIR-43 is subject to the discretion of the Secretary.

*Id.*  By invoking this automatic stay provision, DHS ensured that Morales Lopez would remain detained, despite posting bond.  (ECF No. 31 at 3.)

On October 1, 2025, Morales Lopez filed his original habeas corpus petition, challenging his detention on the ground that the automatic stay regulation violated federal statute and the Constitution.  (*See generally* ECF No. 1.)  Nine days later, he moved for a temporary restraining order ("TRO"), asking the Court to enjoin Respondents from conducting his individual hearing on October 15, 2025, which DHS had set on October 2, 2025—*i.e.*, only a day after he filed his original habeas petition. (ECF No. 10 at 2.)

On October 14, 2025, the Court denied Morales Lopez's first motion for a TRO. (ECF No. 13.)  The Court reasoned that, while it appeared that Respondents may have set the individual hearing in retaliation of Morales Lopez initiating this judicial proceeding, "Morales Lopez's habeas petition—which challenges only the legality of his

detention—has little to no nexus to the relief he actually requests in his Motion—which concerns only the merits of his underlying immigration case." (*Id.* at 3.)  Put differently, the Court saw no legal basis to disturb the date of the individual hearing.[5]  (*Id.*)

On October 20, 2025, Morales Lopez filed a second motion for a TRO, this time arguing that he should be immediately released "because he continued to anguish two (2) months longer in conditions this District has recognized as 'more akin to incarceration than civil confinement,'" and because he was likely to show that the automatic stay regulation was unlawful.  (ECF No. 14 at 1 (citation omitted).)

On October 23, 2025, however, the Board of Immigration Appeals ("BIA") vacated the IJ's bond order. (ECF No. 18 at 17.)  In a three-paragraph, skeletal order, the BIA cited its intervening decision in *Matter of Yajure Hurtado*, 29 I&N Dec. 216, 225 (BIA 2025), which "conclud[ed] Immigration Judges lack the authority to hear bond request or to grant bond to aliens who are present in the United States without admission."  (ECF No. 18 at 17.)  And in the BIA's view, Morales Lopez "is present in the United States without admission . . . ."  (*Id.*)  Accordingly, the BIA concluded that "there is no authority to grant a bond in this case."  (*Id.*)

In light of this development, the Court "querie[d] whether the BIA's decision renders this habeas action moot."  (ECF No. 21 at 1.)  Therefore, the Court directed the parties to file supplemental briefs on the mootness issue and "whether they believe it would be appropriate for the Court to grant Morales Lopez leave to amend his habeas petition in response to the recent, fundamental developments in this case."  (*Id.* at 3.)

---

[5] On October 15, 2025, an IJ continued the individual hearing to a future date.  (ECF No. 16 at 1.)

The parties filed supplemental briefs at the Court's direction.  (ECF Nos. 25, 29.)
In addition, and without prompting from the Court, Morales Lopez filed an unopposed
motion to amend and supplement his original habeas petition.  (ECF No. 23.)  On
November 14, 2025, the Court granted the unopposed motion to amend, directing
Morales Lopez to file his first amended habeas petition by November 18, 2025.  (ECF
No. 30.)  The Court also denied as moot Morales Lopez's original habeas petition and
second TRO motion.  (*Id.*)  In the Court's view, the BIA's decision rendered those
matters moot because the automatic stay regulation was no longer responsible for
Morales Lopez's continued detention.  (*Id.*)

On November 17, 2025, Morales Lopez filed his amended habeas petition,
wherein he raised three claims: (1) violation of 8 U.S.C. § 1226(a), INA § 236(a); (2)
violation of the Due Process Clause of the Fifth Amendment to the United States
Constitution—Substantive Due Process; and (3) violation of the Administrative
Procedure Act.  (ECF No. 31 at 12–14.)  In support, he argued that Respondents cannot
detain him pursuant to section 1225(b)(2)(A) because it applies only to immigrants
"appl[ying] for admission" to the United States—not immigrants who, like him, have
been present in the country for decades.  (*See generally id.*)  As such, Morales Lopez
sought immediate release from detention or, alternatively, immediate release pending a
bond hearing.  (*Id.*; *see also* ECF No. 38 (adding alternative request for a bond
hearing).)  That same day, the Court set an oral argument on the matter.  (ECF No. 32.)

On November 20, 2025, Morales Lopez filed a third motion for a TRO, arguing
that he was entitled to immediate release for the same reasons raised in his Petition.
(ECF No. 33.)  The next day, however, the Court denied this third TRO motion.  (ECF

No. 34.)  The Court signaled to the parties that it "will likely conclude, as numerous other courts have, that undocumented immigrants who have resided in the country for years fall within the auspices of section 1226(a)—not section 1225(b)(2)(A)."  (*Id.* at 2.) Nevertheless, the Court was not convinced at that time—based on the arguments asserted and caselaw cited by Morales Lopez—that it had the authority to order for "his immediate release, untethered to a bond hearing."  (*Id.*)  As a result, the Court denied the third TRO motion, while also inviting Morales Lopez to cite caselaw supporting his position that immediate release without a bond hearing is available.  (*Id.* at 3 n.3.)

On November 28, 2025, Morales Lopez asked the immigration court for a new bond hearing in light of intervening law.  (*See* ECF No. 37 at 1 (citing *Bautista v. Santacruz*, 2025 WL 3288403, at *9 (C.D. Cal. Nov. 25, 2025) (certifying class of noncitizens in similar situation to Morales Lopez).)  On December 4, 2025, an IJ ruled that it lacked jurisdiction under the *Yajure Hurtado* decision.  (*Id.*)

On December 12, 2025, the parties jointly moved to vacate the December 18, 2025 oral argument.  (ECF No. 39.)  Therein, they asserted that, "[a]ssuming . . . that the Court will likely conclude that Petitioner's detention is properly under Section 1226(a), not Section 1225(b), the parties submit that the relief is to direct that Petitioner be provided with a bond hearing pursuant to Section 1226(a) on or before December 18, 2025.  Directing such a bond hearing in lieu of ordering immediate release is appropriate."  (*Id.* at 3–4.)

Pursuant to this joint position, the Court vacated the oral argument and directed Respondents "to provide Morales Lopez with a new bond hearing pursuant to section 1226(a) on or before December 18, 2025**.**"  (ECF No. 40 at 2.)  The Court also directed

7

Respondents to provide the Court with a status report as to Morales Lopez's detention within five days of the bond hearing. (*Id.*)

On December 24, 2025, Morales Lopez filed an Emergency Motion to Enforce Court Order and for Immediate Release. (ECF No. 42.) He claimed that an IJ granted him bond in the amount of $10,000, that he had posted that bond, but that he nonetheless remained unlawfully detained. (*Id.* at 1.) That same day, Respondents filed a status report stating that Morales Lopez's release was delayed because "ICE was experiencing technical difficulties with the electronic bond system." (ECF No. 43 at 3.) Respondents added:

> As to next steps, Respondents submit that at this point, the Court has resolved the issues presented in the amended habeas petition (ECF No. 31), which, as explained above, challenged Petitioner's detention under Section 1225(b)(2) without an opportunity to seek bond. Now that Petitioner received a bond hearing and was granted release on bond (which is being processed), no further proceedings [sic] are necessary on that amended habeas petition. Respondents also do not seek a more written detailed decision from the Court. Respondents thus submit that this case is concluded, unless Petitioner intends to seek to amend his habeas petition yet again to raise other issues, and Respondents are not aware of whether Petitioner intends to seek to do so.

(*Id.* at 3–4.)

On December 26, 2025, Respondents filed another status report stating that, "[o]n the morning of December 26, 2025, ICE processed and directed Petitioner's release, and Respondents now confirm that he has been released from custody." (ECF No. 46 at 2.)

On January 5, 2026, the Court granted Morales Lopez's Amended Habeas Corpus Petition and invited him to file a motion for attorney's fees, should he "believe he

has a good faith basis to" do so.  (ECF No. 47 at 9.)  On January 26, 2026, Morales Lopez moved to recover his attorney's fees pursuant to EAJA.  (ECF No. 49.)  The Motion is fully briefed.  (ECF Nos. 55, 56.)

## II.    ANALYSIS

Morales Lopez contends that he is entitled to an award of attorney's fees under EAJA in the amount of $37,926.00.  (ECF No. 49 at 12.)  While the Court concludes that attorney fees are available under EAJA where the Government denies an immigrant a bond hearing pursuant to 8 U.S.C. § 1225(b)(2)(A), the amount of such fees it will award Morales Lopez will be reduced.

### A.  THE GOVERNMENT'S RELIANCE ON 8 U.S.C. § 1225(b)(2)(A) IS NOT SUBSTANTIALLY JUSTIFIED

Under EAJA, a fee award is required if (1) the petitioner is a "prevailing party"; (2) the position of the United States was not "substantially justified"; and (3) there are no special circumstances that make an award of fees unjust.  28 U.S.C. § 2412(d)(1)(A). These fundamental EAJA principles apply just the same in the immigration habeas corpus context.  *Daley v. Ceja, et al.*, 158 F.4th 1152, 1166 (10th Cir. 2025).  Here, the Government challenges only the second EAJA element: whether its position was substantially justified.  Accordingly, the Court cabins its analysis to only that issue.

The Government bears the burden of showing that its legal position was substantially justified.  *See Gilbert v. Shalala,* 45 F.3d 1391, 1394 (10th Cir.1995).  To determine whether the government's position was substantially justified, courts must look at the "totality of the circumstances, as reflected in the record before the court."  *United States v. Charles Gyurman Land & Cattle Co.*, 836 F.2d 480, 485 (10th Cir. 1987).  "While the parties' postures on individual matters may be more or less

justified," courts should treat the case "as an inclusive whole, rather than atomized line-items." *Commissioner, I.N.S. v. Jean*, 496 U.S. 154, 161–62 (1990).  "The test for substantial justification in this circuit is one of reasonableness in law and fact."  *Id.*  Thus, the Government's position must be "justified to a degree that could satisfy a reasonable person."  *Pierce v. Underwood,* 487 U.S. 552, 565 (1988).  The Government's "position can be justified even though it is not correct."  *Id.* at 566 n.2. Additionally, the Government's prelitigation actions and litigation position "are both relevant to the inquiry and must be reasonable in fact and law."  *Al-Maleki v. Holder*, 558 F.3d 1200, 1207 (10th Cir. 2009) (citation omitted).

Applying these principles, the Court concludes that the Government has failed to show that its position in this case[6]—that section 1225(b), not section 1226(a), applies—was substantially justified.  The Government's position is not substantially justified principally because it is based on an abrupt, "revised" interpretation of the relevant sections of the INA in July 2025, seemingly in an effort to accomplish the current administration's policy objectives—namely, meeting mass deportation quotas. *See* Memorandum from Rodney S. Scott, Comm'r of U.S. Customs & Border Prot.,

---

[6] Morales Lopez contends that the Government's position in this case was not solely based on its invocation of section 1225 but also its reliance on the automatic stay regulation. (ECF No. 56 at 3.)  The Court agrees that the Government's position with respect to the automatic stay provision is relevant to the EAJA issue and that this position was not reasonable, as the Court has already found misplaced the Government's reliance on the automatic stay regulation in another case.  *See Moreno Santana v. Baltazar*, 2026 WL 709759, at *5 (D. Colo. Mar. 13, 2026) (concluding that the automatic stay regulation violates procedural due process).

Notably, the Government does not attempt to defend its reliance on this regulation in its response.  And in contrast to the section 1225(b) issue, the Court is unaware of any other court that has rejected an immigrant's challenge to the automatic stay regulation on similar facts. Thus, the Government's reliance on this regulation during the initial phase of this action constitutes a separate and independent basis for the Court's conclusion that its position was not substantially justified under EAJA.

Detention of Applicants for Admission (July 10, 2025)

(https://www.cbp.gov/document/foia-record/detention-applicants-admission)

[https://perma.cc/56W9-TNPW] ("revising" DHS's legal position from its "historical"

treatment of certain noncitizens); *see also Arias v. Noem*, 818 F. Supp. 3d 864, 865

(W.D. Tex. 2026) (observing that the current administration has "daily deportation

quotas," and describing them as "ill-conceived and incompetently-implemented").

"This 'new understanding' of a decades-old statute has resulted in the

government detaining hundreds of thousands of nonviolent individuals, often without

due process or other constitutional protections."  *Salazar v. Noem*, 2026 WL 594606, at

*1 (D. Neb. Mar. 3, 2026).  And, in turn, the Government's reckless mass detention

campaign has resulted in these individuals being forced to file thousands of habeas

corpus petitions in federal courts across the country, dramatically increasing the already

over-burdened caseloads of federal district and circuit courts across the land.  *See id.*

("It has also sparked *thousands* of lawsuits where courts have ordered release of those

wrongfully detained, for which neither immigration courts nor the Department of Justice

have seemed prepared."); *see also Coronado v. Sec'y, DHS*, 2025 WL 3628229, at *7

(S.D. Ohio Dec. 15, 2025) (noting that, as of December 2025, "district courts have

issued more than 700 decisions addressing the topic"); *Buenrostro-Mendez v. Bondi*,

166 F.4th 494, 500 (5th Cir. 2026) (noting that, as of February 2026, "well over a

thousand aliens have filed habeas corpus petitions seeking bond hearings").

Morales Lopez's case is a prime example of how capricious and costly the

Government's position is given the reality of the facts on the ground.  With respect to

the capriciousness of the Government's position, DHS originally classified Morales

11

Lopez as "an alien present in the United States who has not been admitted or paroled" pursuant to 8 U.S.C. § 1226(a)(6)(a)(i), only to then suddenly change its position (by slashing through its notice determination document and writing the word "cancelled") for seemingly no legitimate legal reason. *See Barbosa da Cunha v. Freden*, — F.4th —, 2026 WL 1146044, at *19 (2d Cir. Apr. 28, 2026) ("[F]or five Presidential administrations over nearly three decades, [the Government] did consistently release detainees on bond whom the government now argues are covered by Section 1225(b)(2)(A). Even in President Trump's first term (and the first few months of his second), the Agency adhered to the decades-old understanding on the relative scopes of Sections 1225 and 1226."). (ECF No. 31 at 20.)

With respect to the costs, the factual and procedural history outlined above speaks for itself: The Court and the parties have had to expend considerable resources resolving the merits of this matter. And it goes without saying that this time and effort pales in comparison to the freedom Morales Lopez lost for months of his life.

Given these circumstances, the Court concludes that the Government's reliance on 8 U.S.C. § 1225(b)(2)(A) is not substantially justified under EAJA. *Al-Maleki*, 558 F.3d at 1207.

The Government's arguments to the contrary do not persuade the Court otherwise. First, in arguing that its position is substantially justified, the Government continues to rely on its statutory interpretation of 8 U.S.C. § 1225(b)(2)(A). (*See* ECF No. 55 at 7 (incorporating statutory arguments it made in its other filings).) But this steadfast reliance does not justify the Government's "radical departure from the historical treatment of noncitizens who entered the United States without inspection."

*Salazar*, 2026 WL 594606, at *1.  As this Court and countless others have explained,

decades of agency practice and judicial interpretation bely this sudden about-face.  *See*

*id.* ("[T]he government apparently expects it can transform an entire area of

administrative law because it unilaterally decided that, for thirty years, everyone was

wrong about what a statute meant.").

Moreover, "[t]he Supreme Court has repeatedly rejected ahistorical and strained

readings of old statutes to justify expansive executive power."  *Id.*; *see also Learning*

*Res., Inc. v. Trump*, 607 U.S. —, — (Feb. 20, 2026) (rejecting the executive's reliance

on the International Emergency Economic Powers Act **"**to unilaterally impose

unbounded tariffs and change them at will," because "[t]hat view would represent a

transformative expansion of the President's authority over tariff policy"); *Ala. Ass'n of*

*Realtors v. Dep't of Health and Hum. Servs.*, 594 U.S. 758, 761 (2021) (rejecting

argument that a 1944 public health regulation "justif[ied] an eviction moratorium"); *Nat'l*

*Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 119 (2022) (rejecting argument that

the Occupational Safety and Health Act of 1970 permitted the promulgation of a vaccine

mandate).  The Supreme Court has reiterated this principle since at least 1941:

> Authority actually granted by Congress of course cannot
> evaporate through lack of administrative exercise.  But just
> as established practice may shed light on the extent of
> power conveyed by general statutory language, so the want
> of assertion of power by those who presumably would be
> alert to exercise it, is equally significant in determining
> whether such power was actually conferred.

*FTC v. Bunte Bros.*, 312 U.S. 349, 352 (1941); *see also Util. Air Regul. Grp. v. EPA*,

573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute

an unheralded power to regulate a significant portion of the American economy, we

13

typically greet its announcement with a measure of skepticism.") (internal quotation marks and citation omitted).

Hence, the Court finds and concludes that the Government's statutory interpretation argument is as unavailing at the merits stage as it is in this EAJA stage.

That brings the Court to the Government's second argument for why its mandatory detention position can't lack substantial justification: because other federal courts throughout the country have adopted its view.  (ECF No. 55 at 9.)  The Court acknowledges that another judge in this District, as well as two Circuit courts,[7] have interpreted the relevant provisions of the INA as the Government does.  *See, e.g.*, *Singh v. Baltazar*, 2026 WL 1282828 (D. Colo. May 11, 2026) (Domenico, C.J.); *Buenrostro-Mendez*, 166 F.4th at 500 (5th Cir. 2026); *Avila v. Bondi*, 170 F.4th 1128 (8th Cir. 2026). The Court also recognizes that the Tenth Circuit has suggested that the Government's position is more likely to be substantially justified "when the legal principle on which it relied is 'unclear or in flux.'"  *Evans v. Colvin*, 640 F. App'x 731, 733 (10th Cir. 2016) (quoting *Martinez v. Sec'y of Health & Hum. Servs.*, 815 F.2d 1381, 1383 (10th Cir. 1987)).[8]

In the Court's view, however, this authority does not foreclose its holding that the Government's position lacks substantial justification.  True, as discussed, there is disagreement among the federal courts as to whether mandatory detention is

---

[7] As of this writing, the Tenth Circuit has not weighed in on this issue.

[8] Additionally, the Court recognizes that some other courts that have rejected the Government's interpretation of the INA have nonetheless found that its position was substantially justified.  *See, e.g.*, *Serrano-Martinez v. De Anda-Ybarra*, 2026 WL 1068150, at *29 (D.N.M. Apr. 20, 2026); *Kadidiatou v. Easterwood, et al.*, 2026 WL 969017, at *1 (D. Minn. Apr. 10, 2026).

appropriate for certain noncitizens under 8 U.S.C. § 1225(b)(2)(A). Upon further inspection, however, it is clear that the disagreement is not remotely balanced on a numerical basis. According to one district court, for example, as of late 2025 an overwhelming majority of district courts had concluded that section 1225(b) does not govern on these facts. *See Barco Mercado v. Francis*, 2025 WL 3295903, at *13 (S.D.N.Y. Nov. 26, 2025) (collecting 362 district court opinions nationwide and noting that challengers prevailed in at least 350 of them, in decisions by over 160 judges across fifty courts).

And more recently, one source has reported that, of the roughly 12,000 federal district court cases around the country to have addressed the mandatory detention issue, roughly 10,800 decisions have found in favor of the immigrant, whereas only roughly 1,300 decisions have found in favor of the Government. Kyle Cheney & Jessie Blaser, *Explore the data: 10,000 rulings against Trump in ICE cases*, POLITICO (last accessed on May 19, 2026), https://www.politico.com/news/2026/05/13/mandatory-detention-ice-cases-rulings-database-00913988. Of those 10,800 decisions in the immigrant's favor, approximately 7,300 of them were based on the conclusion that section 1225 does not apply to migrants like Morales Lopez. *Id.*

These data confirm the following: The Government's statutory interpretation of section 1225(b) has been rejected by a vast, overwhelming majority of federal district judges across the country. *See Fermenar-Mast v. Jamison*, 2026 WL 1365013, at *2 (E.D. Pa. May 15, 2026) ("While none of the foregoing appellate authority is binding on this Court, the decisions in *Barbosa da Cunha, Lopez Campos*, and *Fidencio Alvarez* align with this Court's analysis in *Ndiaye* and with over 10,000 decisions of over 424

15

district judges across the nation who, as of May 13, 2026, have also rejected the government's position."); *see also Barbosa da Cuhna*, 2026 WL 1145044, at *21 (noting that "over 370 different judges across the Nation have rejected the government's plain text argument—such that we could not consider the long-standing agency practice that contradicts the government's position").

Notably, moreover, until very recently, the Government's position enjoyed no support from any of the Judges in this District.  *See, e.g., Mendoza Gutierrez v. Baltasar*, 2025 WL 2962908 (D. Colo. Oct. 17, 2024) (Rodriguez, J.), *appeal docketed*, No. 25-1460 (10th Cir. Dec. 16, 2025); *Moya Pineda v. Baltasar*, 2025 WL 3516291 (D. Colo. Oct. 20, 2025) (Gallagher, J.); *Loa Caballero v. Baltazar*, 2025 WL 2977650, at *5 (D. Colo. Oct. 22, 2025) (Wang, J.); *Nava Hernandez v. Baltazar*, 2025 WL 2996643 (D. Colo. Oct. 24, 2025) (Sweeney, J.); *Arredondo v. Baltazar*, 2025 WL 4083607 (D. Colo. Oct. 31, 2025) (Jackson, J.); *Florez Marin v. Baltazar*, 2025 WL 3677019 (D. Colo. Dec. 18, 2025) (Brimmer, J.); *Aleman Hernandez v. Baltazar*, 2025 WL 3718159 (D. Colo. Dec. 23, 2025) (Crews, J.); *Garcia Abanil v. Baltazar*, 817 F. Supp. 3d 1148 (D. Colo. 2026) (Martínez, J.); *but see Singh*, 2026 WL 1282828 (Domenico, C.J.).  All this supports the conclusion that the Government's position on the application of section 1225 in these circumstances lacks merit.

The Court pauses to note the particular persuasiveness of the Second Circuit's *Cunha* decision on the substantial justification issue before it.  That case involved a noncitizen who had unlawfully entered the country over 20 years ago, applied for asylum, was granted work authorization, and had never been arrested.  *Id.* at *2.  The Second Circuit discussed the relevant statutory scheme governing detention of

16

noncitizens and noted, in part, that "noncitizens who have been in the United States for more than two years get full removal proceedings, may be detained, and may be granted release on bond or conditional parole, . . . unless they have committed certain crimes . . . ." *Id.* at *14 (citing *Jennings v. Rodriguez*, 583 U.S. 281 (2018), which cites 8 U.S.C. § 1226(a)). The Second Circuit affirmed that, "'once an alien enters the country, the legal circumstance changes, . . . whether their presence here is lawful, unlawful, temporary, or permanent.'" *Id.* (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)). The *Cunha* court was tasked with answering whether a noncitizen is to be considered an "applicant for admission" and one who is "seeking admission," such that the individual would fall under section 1225(b)(2)(A)'s mandatory detention provision. *Id.* at *5. The Second Circuit held in the negative, determining that the "Petitioner may be an 'applicant for admission,' but he is not 'seeking admission,'" such that his detention fell under the discretionary provision of section 1226(a). *Id.*

The Second Circuit's decision was based on its review of the plain text of the pertinent provisions of the INA, and further confirmed by the statute's context, structure, history, and purpose. *Id.* As to the plain text, the Second Circuit reasoned that "the only coherent interpretation of Section 1225(b)(2)(B)(iii) is that it clarifies that Section 1225(b)(2)(A)'s broad referral of noncitizens to full removal proceedings under Section 1229a does not apply to stowaways." *Id.* at *13. As to the statute's context, the Second Circuit explained that "Petitioner's interpretation of 'seeking admission' under Section 1225(b)(2)(A) is completely consistent with the consideration of that provision in the overall structure and context of the detention framework set forth in the statutory scheme.'" *Id.* at *16. And as to the history and purpose of the statute, the Second

17

Circuited declared that the Government's position "casts aside" and "undermines the very purpose that it purports to advance—treating similarly situated noncitizens alike." *Id.* at *18, 19.

The Court strongly agrees with the thorough and exacting analysis by the *Cunha* panel of the section 1225 issue and, as a result, holds that the Government's overall position in this case—including its position prior to the commencement of litigation— lacks substantial justification.  As such, the Court finds and concludes that attorney fees under EAJA are available to Morales Lopez and those similarly situated.

## B.  ATTORNEY FEE AMOUNT

Morales Lopez seeks $37,926 in attorney's fees based on 140 hours of work billed at an adjusted rate of $270.90 per hour.  (ECF No. 49 at 11.)  This adjusted hourly rate constitutes a departure from the general $125.00 statutory cap imposed by the EAJA.  The Court agrees—and the Government does not contest—that a departure from the statutory cap is appropriate in immigration habeas corpus cases like this one.  Still, the Court finds it appropriate to substantially reduce the fee amount sought here.

EAJA provides that attorney fees are not to be awarded in excess of $125 per hour unless the Court determines that an increase in the cost of living or a special factor justifies a higher fee.  *Taylor v. Colvin*, 2015 WL 2375907 at *2 (D. Colo. 2015).  The party seeking the award bears the burden of persuading the Court that the amount is reasonable.  *Id.*  Furthermore, "the initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate," also called a lodestar calculation.  *Id.; see also Scherffius v. Astrue,* 296 F. App'x 616, 619 (10th Cir. 2008).  The cost-of-living

18

adjustment is determined by multiplying the base EAJA rate of $125 per hour by the

current Consumer Price Index All Urban Customers ("CPI-U"), and then dividing the

product by the CPI-U in the month that the cap was imposed.  *Id.*

The determination of attorney's fees is discretionary, especially given the district

court's close understanding of the litigation and desire to avoid frequent appellate

review of factual matters*.  Rocky Mountain Wild v. Vilsack*, No. 09-cv-01272-WJM, 2013

WL 3233573 at *4 (D. Colo. 2013).

Initially, the Court observes that the Government does not contest the $270.90

billing rate sought by Morales Lopez.  (*See generally* ECF No. 55.)  As such, the Court

need not analyze whether he is entitled to a departure from the statutory cap.[9]  The

Government has waived any challenge to that issue.  *Otte v. Berryhill*, 2018 WL

5263515, at *5 (D. Kan. Oct. 23, 2018).

As to the number of hours recoverable, the Court agrees with the Government

that Morales Lopez seeks to recoup for certain hours that are disallowed under

controlling caselaw.  The Court begins by addressing the Government's challenge to

those hours Morales Lopez's counsel "spent on filings that were unsuccessful or did not

advance success on the merits." (*Id.* at 10.)  The Government specifically targets the

12 hours sought for preparing the first TRO Motion; the 12 hours for the second TRO

Motion; and the 9.5 hours for the third TRO Motion.  (*Id.*)  According to the Government,

the first TRO Motion sought relief with respect to the scheduling of his individual

hearing, which the Court lacked the authority to grant.  (*Id.*)  And as to the second and

---

[9] Were the Court to substantively analyze this issue, however, it would conclude that an upward departure of this magnitude in the hourly rate is necessary in this case.

third TRO Motions, the Government presses that the Motions were unsuccessful because they sought immediate release, a remedy the Court concluded was not permissible at that time.  (*Id.*)

The Court concurs that those hours sought with respect to the first TRO Motion are not recoverable because that Motion had no way of advancing Morales Lopez's position in this habeas action.  Recall that Morales Lopez sought via that Motion an Order enjoining the immigration court from conducting his individual hearing on October 15, 2025, which DHS had set on October 2, 2025—*i.e.*, only a day after he filed his original habeas petition.  (ECF No. 10 at 2.)  In his view, that hearing was set in retaliation for his initiating this habeas action.

But the Court denied that Motion because, while the timing of the scheduling of that hearing appeared to be highly suspect, "Morales Lopez's habeas petition—which challenges only the legality of his detention—has little to no nexus to the relief he actually requests in his Motion—which concerns only the merits of his underlying immigration case."  (*Id.* at 3.)  Thus, the first TRO Motion was wholly unnecessary and, as a result, the 12 hours Morales Lopez's counsel spent pursuing it are not recoverable. *See Mama Jo's, Inc. v. Sparta Ins. Co.*, 2020 WL 6731235, at *7 (S.D. Fla. Oct. 20, 2020), *report and recommendation adopted*, 2020 WL 6729401 (S.D. Fla. Nov. 16, 2020) ("The relevant inquiry is not whether the motion was successful, but whether it was necessary.").

The Court parts ways with the Government, however, with respect to the second and third TRO Motions.  The Government posits that those hours are not reasonable because they sought immediate release—a remedy the Court at the time doubted it had

20

the authority to grant.  (*Id.* at 11.)  Since the Court issued that ruling, however, the

undersigned as come to conclude that immediate release *is* an appropriate remedy in

some immigration habeas cases.  *See, e.g., Pal v. Lyons*, 2026 WL 937962, at *4 (D.

Colo. Apr. 7, 2026) (Martinez, J.) (granting immediate release given "the mounting

evidence that bond determination hearings conducted in Immigration Court under §

1226(a) have preordained outcomes").  The Court will not fault Morales Lopez for

seeking a remedy the Court would later come to allow in subsequent immigration

habeas corpus cases.

Nor does the Court accept the Government's challenge to the 20 hours Morales

Lopez spent moving to amend his original habeas corpus petition, when the Court had

already ordered supplemental briefing instead, and filing a Reply to his first habeas

corpus Petition, when the Court had already indicated that the original Petition "was

likely moot."  (*Id.* at 11–12.)  While the motion to amend was unprompted by the Court,

the Court ultimately accepted that filing because the facts on the ground had changed:

The BIA had vacated the IJ's bond Order; Morales Lopez was being detained as a

result of section 1225 (not the automatic stay regulation); and he therefore had to shift

his litigation strategy.  In other words, the motion to amend surely advanced Morales

Lopez's position in the litigation.  And while the Reply to the original habeas corpus

Petition was unnecessary in hindsight, that was not definitively known to Morales Lopez

when he filed it.  The Court does not blame his counsel for filing that document when

the Court had merely "indicated" (in the Government's words) that the original petition

may be moot.  (*Id.* at 12.)

Next, the Government argues that Morales Lopez should not be permitted to

21

recover fees for 14 hours spent on clerical or administrative tasks and "because they reflect time [his] counsel spent learning procedural rules or general statutes." (*Id.* at 12.)  Morales Lopez counters that his counsel is a solo practitioner who was litigating her first case in federal court, so some of the challenged hours—including the 8 hours she spent serving the defendants, the half an hour applying to the Court's bar, and the hours reviewing federal procedural rules—are properly recoverable.  (ECF No. 56 at 8–10.)

The Court appreciates that Morales Lopez's counsel is new to federal practice and does not have the same resources as the federal government.  But the Court generally agrees with the Government that Morales Lopez's request to recover for hours spent applying for admission to the Court's bar, filing his habeas petition, and serving the Government are not recoverable, at least not fully.  The Court questions, in particular, the 8 hours counsel spent serving the Government parties (although the Court acknowledges that there are several defendant-parties in this case).  For this reason, the Court will allow Moralez Lopez to recover fees for only 7 of the 14 hours challenged by the Government as to the category of time the Government characterizes as clerical or administrative.  *See Neil v. Comm'r of Soc. Sec.*, 495 F. App'x 845, 847 (9th Cir. 2012) (preparing and serving summons is non-compensable clerical work); *see also Missouri v. Jenkins by Agyei*, 491 U.S. 274, 288 n.10 (clerical tasks performed by an attorney are not compensable); *Shabazz v. Pinnacle Credit Servs. LLC*, 2016 WL 6892948, at *5–6 (D. Colo. Nov. 23, 2016) (reducing fee award in part due to improper billing for clerical tasks).

Finally, the Government argues that 60.5 hours should be reduced by 50% (to

30.25 hours) because those hours are excessive.  (ECF No. 55 at 13.)  According to the

Government, those excessive hours include the following:

- 3 hours spent researching a single regulation (the auto-stay provision), *see* Ex. 1 at 1;

- 2 hours spent on "factual development," where very limited facts were irrelevant, especially at the outset of the case, *id.*;

- A combined 22 hours on briefing that addressed the legality of the auto-stay regulation (10 hours on the initial habeas petition and 2 hours to review the Response),8 *see id.* at 1, 10 hours on supplemental briefing (9 to prepare Petitioner's brief and 1 hour to review Respondents'), *id.* at 4–5;

- 2 hours for "case analysis" and reassessment of detention theories, *id.* at 4;

- 1 hour to prepare a two-sentence filing (ECF No. 22), *see id.* at 4;

- A combined 24 hours on the second petition for habeas relief, including researching and preparing the petition, reviewing Respondents' response, and researching and drafting Reply, *id.* at 5–7;

- 1 hour for conferral with Respondents' counsel, where Petitioner's conferrals consisted of short emails, *see id.* at 4, 8; and

- 5.5 hours for client communication or conferral with other counsel, *id.* 3, 4, 6, 8.

(*Id.* at 13–14.)

The Government also points out that Morales Lopez's counsel "fail[ed] to bill in

23

six-minute increments," which "renders it difficult to determine what hours expended were reasonable." (*Id.* at 14.)  Consequently, the Government asks the Court to reduce all hours Morales Lopez seeks to recover by 50%, apart from and in addition to the specific reductions it otherwise seeks.  (*Id.* at 15.)

Again, the Court agrees in part with the Government that certain of the hours sought by Morales Lopez are excessive.  For example, the Court questions whether preparing the second habeas petition reasonably necessitated a total of 24 hours of work.  (*Id.* at 18.)  But the Court disagrees with the Government, on the other hand, that other hours were unreasonably spent, like the hour Morales Lopez's counsel spent conferring with opposing counsel and the roughly five hours she spent conferring with her client and other counsel.  (*Id.*)

It is difficult to discern exactly which of these hours were excessive because, as the Government understandably emphasizes, Morales Lopez's counsel engaged in block billing.  (*See generally* ECF No. 55-1.)  Based on both the above circumstances— *i.e.*, that certain hours appear facially excessive and that counsel consistently engaged in block billing—the Court elects to exercise its discretion to decrease the entire fee award amount sought by 20%.  *See Ebonie S. v. Pueblo Sch. Dist. 60*, 2016 WL 1110442, at *3 (D. Colo. Mar. 22, 2016) (reducing hours by 20% due to block billing); *see also Welch v. Metropolitan Life Ins. Co.,* 480 F.3d 942, 948–49 (9th Cir. 2007) (affirming district court decision to reduce requested time by 20% to account for use of quarter-hour increments).

To recap, Moralez Lopez seeks to recover for 140 hours his counsel spent litigating this action.  For the reasons explained above, the Court will reduce this amount

24

by 19 hours based on the first TRO Motion, which was unnecessary, and some of the

clerical or administrative tasks, which are not recoverable.  The Court concludes, and

the Government does not contest, that an adjusted billing rate of $270.90 per hour is

appropriate in this case.  Accordingly, the gross amount of attorney's fees to which

Morales Lopez is entitled would be $32,778.90 (121 hours multiplied by $270.90).

In addition, because many of these 121 hours were excessive, and because

counsel consistently engaged in impermissible block billing, the Court will further reduce

this amount by 20%.  *See Fox v. Vice*, 563 U.S. 826, 838 (2011) ("[T]rial courts need

not, and indeed should not, become green-eyeshade accountants.  The essential goal

in shifting fees (to either party) is to do rough justice, not to achieve auditing

perfection.").

In sum, then, the Court will grant Morales Lopez his attorney's fees in the amount

of **$26,223.12** ($32,778.90 less 20%).

### III.    CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1.  The Motion is GRANTED IN PART AND DENIED IN PART as more fully set
    forth above; and

2.  Morales Lopez is AWARDED attorney's fees under the EAJA in the total
    amount of **$26,223.12**.  The Government is ORDERED to make such
    payment in full to Morales Lopez by no later than **June 26, 2026**.

25

Dated this 29th day of May, 2026.

BY THE COURT:

_____
William J. Martinez
Senior United States District Judge